# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:                        :

GEORGIA A. STEWART,                      :

        Plaintiff,                        :

     v.                                  :   Case No.
                            :   17-cv-495 (CKK)
THE DISTRICT OF COLUMBIA,                :

        Defendant.                        :

                            :

Thursday,
November 8, 2018

Washington, District of Columbia

DEPOSITION OF:

GEORGIA A. STEWART

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition, in

the law offices of the District of Columbia

Office of the Attorney General, located at 441

4th Street, NW, Suite 630 South, when were

present on behalf of the respective parties:

2

APPEARANCES:


On Behalf of the Plaintiff:

JOHN W. DAVIS, ESQ.
1629 K Street, NW
Suite 300
Washington, D.C. 20006
(202) 403-2276
jwdalaw@gmail.com


On Behalf of the Defendant:

CHRISTINA OKEREKE, ESQ.
Assistant Attorney General

D.C. Office of the Attorney General

441 4th Street, NW

Suite 630 South

Washington, D.C. 20001

(202) 727-5173

christina.okereke@dc.gov

P-R-O-C-E-E-D-I-N-G-S

(10:24 a.m.)

WHEREUPON,

GEORGIA A. STEWART

was called as a witness by Counsel for the Defendant, and after having been first duly sworn, was examined and testified as follows:

MS. OKEREKE:  Good morning, Ms. Stewart.

THE WITNESS:  Good morning.

MS. OKEREKE:  My name is Christina Okereke.  I'm with the Attorney General's Office. I know we've met before.  Have you ever had your deposition taken before?

THE WITNESS:  Yes.

MS. OKEREKE:  Okay.  Was that in the context of your position in the mediation office at OHR?

THE WITNESS:  Yes.  Not the mediation, but in context with the office.

MS. OKEREKE:  Okay.  And in your capacity as an employee of the office at the

7

THE WITNESS:  No.

MS. OKEREKE:  Are you under any medications that would prevent you from being able to answer questions truthfully and completely today?

THE WITNESS:  No.

MS. OKEREKE:  Okay.

DIRECT EXAMINATION

Q     Have you ever been known by any name other than Georgia Stewart?

A     No.  Yes, Evans, my maiden name.

Q     Okay.  That's the only other one?

A     Yes.

Q     Okay.  And how old are you, Ms. Stewart?

A     Sixty-nine.

Q     What is your date of birth?

A     ███████, 1949.

Q     And how old were you at the time that you were terminated from OHR?

A     That's something I'd have to think about.  It may have -- I'm not quite sure.  It

8

may have been -- That was in September of 2016, sixty-seven.

Q    Sixty-seven, okay.  Do you live with anyone?

A    Yes.

Q    Who do you live with?

A    My niece, my nephew.

Q    Do you have to financially support any of those people?

A    Yes.

Q    Which ones?

A    My nephew and my niece.

Q    Okay.  Are you  alleging that the termination affected your ability  to be able to financially support your niece and nephew?

A    No.

Q    All right, have you ever been convicted of any crime?

A    No.

Q    When did you first begin employment with the District of Columbia?

A    October 7th, 1967. However --

Q      I'm sorry?

A      I said however, they changed the date to 10-01.  Why, I don't know.  Personnel did that, I think.

Q      They changed your official start date to October 1st, 1967.

A      I have no idea why they -- to October 1, 1967.

Q      Okay.  I'm sorry, before I ask you about your employment history, have you ever brought a lawsuit before other than this one?

A      Yes.  Well, I  think you need to explain that.

MR. DAVIS:  You know, just answer the questions yes or no.

THE WITNESS:  Okay, yes.

BY MS. OKEREKE:

Q      Okay.  What was the -- How many lawsuits have you brought other than this one?

A      I'm not absolutely sure.

Q      Is it more than five or less than five?

24

oversite I think of the office -- the front office to ensure that it was covered appropriately, administrative staff.  I also assisted the director in dealing with PO contractors and what have you.

Q    Okay.  And what was your next position after that?

A    Mediation manager.

Q    When did you become the mediation manager?

A    Technically the mediation coordinator -- the operations manager were all interchangeable, so it really started at the point of being the coordinator -- the coordination of mediation.  At that point, all those -- mediation was still involved in the process even though I had a different title.  I still had the responsibility of mediation.

Q    Was it considered a promotion?  I mean, like when you like went to mediation manager as opposed to operations manager and mediation coordinator?

25

A     Yes, it was.

Q     Did you become an MSS employee at that point?

A     I was told that I was MSS, yes.

Q     Had you not been MSS before taking on the mediation manager position?

A     I'm not sure.  That's questionable. I'm really not sure.

Q     All right, when did you start the mediation manager position and I might have asked that already.

A     You mean officially?

Q     Yes.

A     As I stated before, it basically started when I was the coordinator -- mediation coordinator and operations manager.  All those things were under my purview.

Q     As mediation manager, did you supervise employees?

A     Contractors initially -- pro bono contractors  -

Q     And what was --

26

A    -- and the front staff -- the administrative staff at the front desk.

Q    And what was the nature of the work the pro bono contractors were doing?

A    They were mediators.  They would come in and conduct mediations.

Q    Can you describe what the mediation unit at OHR does generally?

A    The mediators are required to come in and sit with the parties and determine if they agree -- Well first it wasn't mandatory and then it became mandatory.  The parties would sit down and conduct an ADR session to see if the complaint can be resolved.

Q    And how did your duties and responsibilities as the mediation manager relate to that?

A    I was both -- I was a mediator -- certified mediator and also the supervisor of mediation.

Q    What were your duties and responsibilities as the supervisor?

A    As a supervisor I had the responsibility to ensure that the mediation was scheduled in a timely manner and the case would process -- they were processed.  And once mediation was conducted, the case would go forward for investigation.  I had to also -- I was also responsible for executing all of the grievance that came through the office -- every grievant that came through and was closed, I personally had to perfect that agreement for execution directive -- signature by the director.

Q    When you say you had to perfect the agreements, what exactly did you have to do?

A    Well it's a settlement agreement that was executed by -- Well Nadine Wilburn was the office director.  And she had a draft -- mediation document that we had to utilize in perfecting all of our settlement agreements and that's we utilized.  So when the parties would come in, we'd take that agreement and insert the terms that the parties agreed to as resolution of the complaint.

42

A    No.

Q    Do you know who she reported to at that time?

A    Velasquez.

Q    Okay.  And once Ms. Palacio became the director, did she then become your direct supervisor?

A    Yes.  There was no deputy, so she was -- I reported directly to her.

Q    Okay.  Did there ever come a time after she became the director that a deputy director was hired?

A    I'm not sure on that issue.  I saw a title.  I don't know if he was hired or acting or what.  And that was Coefield.

Q    Coefield?

Yes, but he was not considered my supervisor.  I continued to report to Monica.

Q    Okay.  When you were under Monica's supervision, would you have regular meetings with her?

A    When she was available, yes.

49

take him in the conference room to train this particular employee.  And Monica called me.  She said to me, I want you to start updating MATS every 24 hours.

Q    What is MATS?

A    That's internal problematic system that they have in place at the office.

Q    And what is reported in there in MATS?

A    Well, it should be intakes, our processing MATs, mediations are processed in MATS, and also commission cases are processed via MATS.

Q    Okay.  And Monica asked you to update MATS every 24 hours?

A    Yes.

Q    Did she say why she was asking you to do that?

A    No.  She just said I want you to start updating MATS every 24 hours.  And I said to her, I said that would be somewhat difficult and that perhaps 48 hours would work better than 24 hours.  And if we had an additional administrative

person, we could probably meet that mandate.

Q    And what did --

A    She said that's not going to happen.

Q    Did you say anything else to her at that time?

A    Well I told her I would attempt to meet her demand by any means necessary.  I would put forth every effort to try to ensure that, that happened.  However, I repeated I thought that an additional administrative person would definitely make that happen.

Q    Okay.  And when did that meeting take place?

A    I can say that it was prior to Santiago coming to my unit, but I don't know of the date specifically.  But that was the beginning of our -- I think -- She kind of -- She didn't like the fact that I said that I thought that an administrative person could make that happen.  And that she wanted it in 24 hours.  She wanted an update every 24 hours.  And she didn't even agree to the 48 hours.  And later on during

51

a meeting, she mistakenly said 48, when in fact, I was told 24 -- every 24 hours.

Q     And did you start updating MATS every 24 hours from then on?

A     I was always updating MATS.  Whenever we got information, I would go in and update MATS.  If I didn't have anybody in the office -- I can't say yes to that because if I didn't have the appropriate staff, it would probably be impossible.  People take off and I'm a single person -- I was the only -- I had Eloisa Rocha who was used on the front desk, as well as mediation.  And had mediators that I used sporadically when we needed them.  But if anybody took off, we were short.

Q     How many people were in the mediation unit during the time when Ms. Palacio was the director?

A     On the onset, I think it was Nellie Phelan and the contractors.

MR. DAVIS:  The question was how many people?

53

A    Oh, yes.  There was a meeting with Monica and Rahsaan Coefield when we were talking about hiring an additional staff person.  And Coefield mentioned in the presence of Monica that -- because I was saying that, you know, we could make this happen but we need an additional staff person.  So Coefield -- Because we had an influx of the criminal --  the return citizen cases. And Coefield leaned over and said, "You annoy me and your unit's dysfunctional."  And I became -- It was in a threatening matter.  He really upset me.  So I asked Monica if we could adjourn the meeting.  And later I sent her a memo explaining how I felt about that.

Q    When was that meeting?

A    There was a memo to that effect.  I think you may have that.  So I don't know the exact date.

Q    Was there anything else that Mr. Coefield said to you in that meeting that was upsetting?

A    The fact that he -- the way he leaned

over and said it, was upsetting to me because he was like in my face.  And in the meeting with Monica and about the update of the 24 hours, he called me a liar in that meeting about Al.  He said, "You're lying.  Al does not speak loud."  You know, and I said Rahsaan, I was there.  I'm telling you I have no reason to lie about what I heard.  And I'm just asking that you speak with him.  I'm not asking that you admonish him or anything.  Just ask him, you know to tone it down or could you have that training conducted in the conference room.  Because my office was sitting - - He was right outside my office and I had to assist the mediators with settlement agreements.  And it was kind of disturbing to me.

Q    Did Santiago report directly to Mr. Coefield?

A    Yes.  He was in charge of intake as a matter of fact.

Q    Okay and with regard to this comment that Mr. Coefield made to you where he leaned over and said, you annoy me --

A    And your unit's dysfunctional --

Q    -- and your unit is dysfunctional.

A    -- when in fact, he was aware of the influx of cases that we had in the office.  And the fact that I needed an additional staff person to make that happen.

MR. DAVIS:  Let her ask the question.

THE WITNESS:  Okay, all right.

BY MS. OKEREKE:

Q    Okay.  And where did that meeting take place?

A    In Monica's office.

Q    Okay.  Was anyone besides you, Monica, and Rahsaan there?

A    No.

Q    Okay.  And I think you said you -- you sent an email or a memo to Monica about Rahsaan's comments afterward.

A    Yes. Yes.

Q    Was it an email or a memo?

A    It was an email in the format of a memo.

56

Q     Okay.  And what did you tell Monica in the email?

A     I don't recall verbatim.  But I think John has that memo.

Q     Do you recall what you said, like in --

A     No.

Q     -- summary?

A     No.

Q     You said Mr. Coefield had the title of deputy director?

A     At some point, yes.

Q     When was he hired, if you know?

A     I don't.

Q     Okay.  Was he still there by the time you left OHR?

A     No, I think he'd left.

Q     Okay.

A     He had another job.

Q     Okay.  Do you know what his duties and responsibilities were generally?

A     No.

58

A       I may have.  I think I did.

Q       Do you recall that conversation?

A       No, not in gist.  But it would probably -- it would be a follow-up to the memo that I sent her.  Whatever I stipulated in the memo is probably what I discussed with Monica.

Q       Okay.  Did there ever come a time when Monica complained about your work and said you weren't doing a good job?

A       Never, no.

Q       Did she ever express to you any dissatisfaction with the mediation unit in general?

A       No.

Q       How about anyone who worked under you in the mediation unit, did she ever complain about any of your subordinates?

A       Keith Grimes, she did mention -- Keith Grimes.

Q       And what did she say about Keith Grimes?

A       There were a number of things that

came about as it relates to Mr. Grimes. First, there were allegations of sexual harassment. I was never provided any information as to who the persons were who alleged sexual harassment. There was a -- He was a -- She said that he was seen sleeping on the job.

Q    Was there anything else that Monica mentioned to you about Keith Grimes?

A    When he was initially hired, she said to me, You have to be careful when you hire people that you know. She said I know because I've hired people and later had issues with them. I said at any point there are issues with Mr. Grimes, he will be treated just like anyone else. If he's not doing the job, we will follow the process.

Q    How did you know Mr. Grimes?

A    I worked with him previously. He was the hearing examiner for OHR.

Q    So he had been employed by OHR in the past?

A    Yes.

62

A      He used to -- He mediated as a pro bono mediator too.  Let me say that.  Let me take it back.  He was a pro bono mediator where there was no stipend program involved.  And then he would still come down and do mediations sporadically.  And then he was included as one of the contract stipend mediators.  And I have to say stipend, they're like contractors.  They're contractors in a sense, but they receive a small stipend to do mediations.

Q      Okay.  Was he ever hired as like a full-time regular employee of the agency as opposed to a contract?

A      Yes, as a mediator after he replaced Nellie Phelan.

Q      Okay.  And was he hired at your recommendation?

A      I told them I thought he was a good -- He could probably do the job based on his knowledge and expertise.  And she interviewed him.

Q      Monica?

63

A        Monica and I think Ayanna.  And I wasn't present at that interview.  How long after he was hired did Monica bring these issues about him to your attention -- the sexual harassment allegation and him sleeping on the job?

A        Close to -- Around the time that she fired him.

Q        When was that?

A        I don't remember the date, but it's -- I really don't remember the date, but it's maybe within six months of my termination, let me put it like that.

Q        Okay.  And did you take any steps to address these complaints that Monica had about Mr. Grimes?

A        I had -- with the issue of sexual harassment, it was part of his performance plan that even though I didn't have any documentation to support their allegation of sexual harassment, I suggested that he take -- I was going to recommend sexual harassment training, although I know he's had it many times.  But that's what I

64

had proposed.

Q    When you proposed that, were you proposing that to Monica?

A    That was in his performance plan, which never happened.

Q    Okay.  And what about his sleeping on the job, did you address that?

A    I counseled him about that as well.

Q    All right, was that verbally or in writing?

A    It was verbal and I may have actually -- I'm not sure if I put it in writing, but it was verbal.

Q    Okay.  And once you took these steps, did you report back to Monica on what you had done to address these issues?

A    Monica requested that I send her a memorandum addressing all the things that we discussed.  And she added to that with some things that she wanted included.

Q    Okay.  And did you do that?

A    Yes, I did.  I sent her that memo.

65

MS. OKEREKE:  Okay.  I can't find things.  Let's mark this.

MR. DAVIS:  Thank you. Is this depo Exhibit 4?

MS. OKEREKE:  Yes. I'm handing you Exhibit 4, Ms. Stewart.

(Whereupon, the above-referred to document was marked as Exhibit 4 for identification.)

BY MS. OKEREKE:

Q     Take a look at it and let me know if you recognize it.

A     Okay, yes.

Q     Okay.  Do you recognize this as the memo you sent Monica about Keith Grimes?

A     Per her request, yes.

Q     Okay.  Did she tell you why she wanted you to send this memorandum?

A     Something happened.  I don't know what.

Q     Okay.  All right, were there any other issues you had with Monica when she was director?

66

A    Yes, I just felt that the staffing of the office was not as favorable to the mediation unit as others.

Q    And what did you think --

A    Like Rahsaan had eight employees.  And when I asked for an administrative staff person, she hired Lakeisha Dinkins to work with Rahsaan.

Q    And who was Rahsaan supervising?

A    Monica.

Q    No, I mean who was Rahsaan supervising?  Who was he in charge of?

A    He had eight staff.  I don't recall of the investigators, one administrative staff person.

Q    When did you ask Monica for an administrative assistant?

A    Well I had Eloisa, but this was when she asked that we update MATS every 24 hours. That's when I initially asked.  But after that I had also approached her about the additional person as well.

Q    Okay.

Q    Okay.

A    -- but there are other things.  I just can't recall all of them right here.

Q    When you refer to the inappropriate staffing, is that regarding the -- you know, she wouldn't hire an admin assistant for the unit?

A    We have -- every case is processed in the office has to be mediated.  We have a mandatory mediation program.  You utilize the one person -- administrative person that I have to assist with the front desk.

Q    This is Eloisa?

A    Yes.  And that happened over and over again.  She was in a -- Eloisa had an office where she had some privacy.  They took her out of that office and placed her in an area near to intake where David Aneiva would call on her to relieve him for lunch and bathroom breaks. Eloisa was responsible for scheduling, contacting the parties, everything that involved making it happen as far as the unit was concerned.  And if she didn't do it, it fell in my lap.

Q    Okay.

A    If she wasn't there, it fell in my lap. I was told not to ask David Aneiva to assist unless I went through Ayanna Lee because he fell under her supervision.

Q    Okay. So Eloisa was responsible for managing the front desk, as well as assisting with the mediation unit?

A    She was responsible for assisting -- She was the staff assistant for the mediation unit. I would say her collateral assignments were to relieve the front desk whenever they needed someone.

Q    Okay. And did you believe that Eloisa having to handle these front desk responsibilities, in addition to being the staff assistant to the mediation unit, made her not sufficiently available to assist you with things?

A    That in combination with the influx of cases that came into the office, which really much overwhelmed our unit.

Q    All right. And when you say Monica

I guess I'll hold that no. I can't think of anything right now.

Q      Okay.  Do you have a reason to believe that Monica was aware of the prior OHR charge you had brought against Mr. Velasquez?

A      I don't know.  I believe she was.

Q      Why do you believe she was?

A      She was in some of our staff meetings. She and Velasquez were rather close.  She replaced the person who she replaced.  Well that's person, I don't want to get -- I know that was her baby's daddy.  She replaced -- Gabe Rojo was Monica's son father.  And that's who Gustavo replaced Monica with.  And Monica said in the office in that job before he actually hired her, he gave her an opportunity to learn the job.  She was pre-selected basically for the job.  And then he made the recommendation to the mayor that she be hired when in fact, Alexis Taylor should have been the person hired for that job.

Q      Okay.  Did Ms. Palacio ever make any remarks to you that you perceived to be age

discrimination?

A       When I complained about Rahsaan Coefield's attitude towards me, she didn't have anything to say.  But I think I raised the age issue in a memo to her about Rahsaan and how he treated me.  And she did nothing about it.

Q       But did she ever say anything to you that you perceived as age discrimination?

A       I can't think of anything right now. I'd have to go back and spend some time and think back on it.

Q       Okay.  And I think you mentioned earlier that you also thought that Rahsaan Coefield discriminated against you based on your age?

A       Absolutely, yes.

Q       And what was it that he did that you believe is age discrimination?

A       When I asked for an assistant -- an administrative assistant, he and Monica got together and hired a younger person to assist. It was just his whole attitude.  He would not

never included in that.

Q    Did Monica ever tell you why mediation wasn't included?

A    No.

Q    Okay.  On what basis do you believe your termination was because of age discrimination?

A    Because she has demonstrated a pattern of terminating older staff more frequently than younger staff.

Q    Are you aware of any other older staff members that Monica terminated?

A    Jewell Little.

Q    How do you spell the first name?

A    J-E-W-E-L-L.

Q    Oh, Jewel like jewelry?

A    Yes.

Q    And how old is Jewell Little, if you know?

A    I know she was over 50.

Q    And what was her position at OHR?

A    She was associated general counsel.

Q    Do you know when she was terminated?

A    No, I know I gave her a ride home that evening.

Q    Are there any other older --

A    Sunu Chandy, over 40.

Q    And she was the general counsel?

A    Yes.

Q    Do you know when she was terminated?

A    I don't know when she was walked off the premises, but I don't remember when.

Q    Okay, all right.  Anyone else?

A    Alexis, I don't know the details behind it, but she was over 50.

Q    What's Alexis' last name?

A    Taylor.

Q    And what was her position?

A    Who, Alexis?

Q    Yes.

A    General counsel.  Sunu replaced Alexis.

Q    Okay.  Do you know when Alexis was terminated?

I didn't say she was terminated. She was let go. I don't know what the circumstances surrounding that. I guess Alexis can better address that.

Q    And did that occur when Monica was the director?

A    Yes.

Q    All right. Anyone else?

A    Melissa Sharpe-Jones.

Q    And how old was she if you know?

A    Over 40.

Q    What was her position?

A    She might have been an investigator, but they had her also doing intake. She was -- I don't know if she was -- I don't know. Her official title is investigator, but she was in -- She has actually been the overseer of intake at some point.

Q    All right. Any --

A    I can't think of -- There's somebody -- I can't think right now if there's anybody else on that list.

**92**

Q    Okay.  Did Monica give you a reason during that meeting why she was terminating you?

She just said she could, because I can.  I looked at her and said why?

Q    Okay.  On what basis do you believe you were subjected to a hostile work environment?

A    Well there were meetings that I wasn't made aware of that was conducted .  That's a way of eliminating me, I believe.  The fact that she did not -- as the director of the agency, it is her responsibility to ensure that the office is staffed appropriately.  She took a blind eye to that when it came to her giving me someone to assist with meeting the mandate of the office with cases of discrimination being mediated and processed appropriately.  That is her -- She's  --

Q    Okay.  Was there anything else you believed which created a hostile work environment?

A    With the exception of one person, all of my employees were transferred internally --

93

Well two, Al Santiago had an issue with performance. He was transferred. Nellie Phelan was transferred. Ochoa was transferred. These are people that I would consider to be less desirable, I believe. And Nellie even asked if being transferred to mediation was a punishment. Nobody wanted to work in the unit really unless they were in trouble.

Q    But these individuals were transferred into the mediation unit?

A    Yes.

Q    Why did you consider that to be creating a hostile work environment?

A    Just as other -- Well I think people should have an opportunity to work. However, I think I should have had some input into -- or at least considering someone to work in the unit other than just -- The only way I could get someone is if you transfer them from another unit. And they came with issues sometimes in other units. I almost felt like -- Well I don't want to -- This is speculative. I won't say that

94

there's the dumping ground.  But I had a lack of control in terms of being able to hire staff that I think I needed.

Q    Okay.  Was there anything else that you believe created a hostile work environment?

A    Yes, I just can't think of any right now on the spot.

Q    And do you have any reason to believe that these things that created a hostile work environment were happening because of  your age?

A    I would say since I am the most senior person, I mean I think age is the reason why I was terminated.  And the fact that Monica did not staff the unit appropriately, which could have caused a problem for me.  I worked long hours trying to meet the mandate of the agency because I didn't have anybody to assist; weekends which was hostile to me. I was compelled to be there. I had to make it happen and including conducting mediations and doing special interest cases. Anything they wanted dumped, they dumped it on me.

95

Q    Was there any other manager, who in your view had appropriate staffing -- had better staffing than you did?

A    Coefield.

Q    And why do you feel he had better staffing than you did?

A    He had eight employees.  I had less than -- much less than eight, two or three at the most.  And then he still didn't meet the mandate of the unit.  They still didn't conduct proper investigations.

Q    Coefield was in charge of investigation?

A    Yes.

Q    What were the other units at OHR?  I mean there's mediation, there's investigations. I think you mentioned intake before.

A    Intake was under Coefield.

Q    Intake was under Coefield?

A    Yes.

Q    Are there any other units in OHR?

A    You've got bullying , which --

understood.

MS. OKEREKE: Okay. I don't have a lot more, but maybe we can take a break for just five or ten minutes.

(Whereupon, the above-entitled matter went off the record at 12:27 p.m. and resumed at 12:50 p.m.)

MS. OKEREKE: Okay, Ms. Stewart, you mentioned during our little break that you remembered the last name of Josephine.

THE WITNESS: Yes.

MS. OKEREKE: Do you want to say that for the record?

THE WITNESS: It's Ansah-Brew. And that's A-N-S-A-H -- Brew, B-R-E-W. That's the chief administrative officer. And there were two older people that I neglected to mention as well that had issues of age discrimination. And that was Elise Parson and Diane Betz.

BY MS. OKEREKE:

Q    Okay. How old is Ms. Parson?

A    I think she's older than I am.

Q    Was she terminated from OHR?

A    I don't know how she left, but she's gone.  And Diane Betz is now with Fairfax County, our former director, Kenneth Saunders.  She left also.  They both filed internal age discrimination complaints.

Q    Was this during Monica's tenure --

A    Velasquez. Velasquez.

Q    Oh, they filed complaints during Velasquez's tenure as director.

A    Monica's still here though.

Q    Do you know how old Diane Betz is?

A    Not really.  I know she's between - she may be over 50.  I'm not sure.

Q    And when you said they filed age discrimination complaints, was that, if you know, through OHR?  Or was that internally through  - Oh, I'm sorry.

A    It may have to OAG, I'm not sure.  I think it may have escalated to be something that the OAG looked into, or the OAG  IG, OAG, but they filed age discrimination charges.

# EXHIBIT 2

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 570-2013-00325 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Georgia A. Stewart | ▓▓▓▓ | ▓▓▓▓ |

| Street Address | City, State and ZIP Code |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| DC OFFICE OF HUMAN RIGHTS | 15 - 100 | (202) 727-4559 |

| Street Address | City, State and ZIP Code |
|---|---|
| 441 4th Street, N.W.,  Suite 570 N,  Washington, DC 20001 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest — Latest |

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **07-27-2012**   Latest **10-27-2012**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. On October 1, 1967, I was hired by the above employer. My current position is EOS Supervisor/Mediation Division. I previously filed a charge of discrimination. On July 27, 2012, I was suspended for making a comment in a meeting. A similarly situated manager (David Simmons, Chief ALJ) made a similar comment and was not disciplined. Around October 19, 2012, Luisa Portillo was a staff assistant to the Mediation Unit but her term expired and she was rehired as an investigator. I was informed that the Director told her he had reservations of rehiring her because she formerly worked in the Mediation Unit. Ms. Portillo was instructed that upon her return as an employee, she should not talk to me. Around October 26, 2012, one of my professional staff (Nellie Phelan) was reassigned to investigation. This is a continuing practice of understaffing the Mediation Unit that I supervise. Employees working under my supervision have voiced their concern and feel intimidated by the Director and their employment is in jeopardy when working under my supervision. The office has also failed to assign additional mediators to me.

II. The Director informed me that my statement about unreasonable projected goals was borderline insubordinate and the managers in the meeting are witnesses to the statement which is the reason for my suspension.

III. I believe I have been suspended, subjected to harassment, a hostile work environment, and unequal terms and conditions of employment in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>*Georgia G. Stewart*<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year)  **1-17-13**<br>MARY E. CHAMBERS<br>NOTARY PUBLIC DISTRICT OF COLUMBIA<br>My Commission Expires September 14, 2015 |
| **1/17/2013**   *Georgia A. Stewart*<br>Date        Charging Party Signature | |

D.C._17 CV 495_000005

# EXHIBIT 3

 **Government of the District of Columbia**
**Mayor Muriel E. Bowser**


**Office of Human Rights**
DISTRICT OF COLUMBIA

One Judiciary Square
441 4th Street NW, Suite 570N
Washington, DC 20001
202.727.4559 tel
202.727.9589 fax
ohr.dc.gov

## MEMORANDUM

**TO:**        **Ventris Gibson**
            **D.C. Office of Human Resources**

**FROM:**    **Mónica Palacio, Director**
            **D.C. Office of Human Rights**

**DATE:**    **August 3, 2015**

**SUBJECT:**    **Justification Memo – Georgia Stewart**

---

This memorandum serves as request for a quality increase for Georgia Stewart, Supervisory
Equal Opportunity Specialist at the DC Office of Office of Human Rights (OHR). OHR requests
a 10% salary increase to Ms. Stewart's current salary of $103,769.81, resulting in an overall
increase to $114,145.81.

Georgia Stewart has been an exemplary and outstanding employee of the D. C Office of Human
Rights (OHR) for many years. Within the last seven (7) years, her performance and experience
in the various aspects of the office and her team leadership in the Mediation Program with OHR
has resulted in complainants receiving both monetary and non-monetary awards and low legal
fees for respondents. The successful resolution of complaints has contributed to a significant
reduction in cases requiring investigations and a reduction in significant legal expenses to both
parties.

This employee's expertise in managing the successful resolution and execution of settlements
eliminates the expense of investigating complaints early in OHR's process and provides positive
results to the constituents, OHR and the District Government. Potential conflicts arising out of
compliance of the Settlement Agreements are expedited in a timely manner alleviating potential
breached Settlement Agreements or reopening of cases. Less than 1% of cases settled result in
allegations of a breached Settlement Agreement. Since January 2012, the Mediation Division
has awarded aggregate monetary benefits in the amount of approximately $8,630,595.38.

Since 2012, the Mediation Division has been called upon to process additional Equal
Employment Opportunity Commission (EEOC) cases that were germane and relevant to meeting
the Federal Contract. This task was handled in an expedient manner and helped to meet the
EEOC Contract, which saved thousands of dollars that were essential to OHR's budget.

This employee is also called upon to mediate sensitive and confidential cases involving
potentially explosive matters of public interest. Cases of this nature are given special attention
and expedited in combination with the day-to-day operation of the Mediation Division.

D.C._17 CV 495_000073

This employee's performance and the resources in her control clearly demonstrate that she is deserving of the proposed increase.   Thank you for your consideration of this matter.

Regards,

Monica Palacio

D.C._17 CV 495_000074

# EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------x

GEORGIA A. STEWART,          :

       Plaintiff,          :

vs.                          :    Case No. 17-0495 (CKK)

MURIEL BOWSER,               :

       Defendant.          :

----------------------x


Deposition of MONICA PALACIO

Washington, DC

Tuesday, March 19, 2019

12:26 p.m.


Job:  235605

Pages:  1 - 91

Transcribed by:  Jo Ann Pawela

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

    JOHN W. DAVIS, ESQUIRE

    1629 K. Street, NW

    Suite 300

    Washington, DC 20006

    (202) 403-2276

ON BEHALF OF THE DEFENDANT:

    CHRISTINA OKEREKE, ESQUIRE

    HNIN N. KHAING, ESQUIRE

    OFFICE OF THE ATTORNEY GENERAL FOR

    THE DISTRICT OF COLUMBIA

    441 4th Street, NW

    Suite 630 South

    Washington, DC 20001

    (202) 727-3400

P R O C E E D I N G S

Whereupon,

MONICA PALACIO

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. DAVIS:

Q    Would you state your full name for the record, please?

A    Yes.  My name is Monica Palacio.

Q    What is your current address?

MS. OKEREKE:  I'll direct the witness to give her work address.

MR. DAVIS:  Okay.

A    My work address is 441 4th Street, Northwest, Washington, DC  20001, Suite 571.

Q    What is your date of birth?

MS. OKEREKE:  I'm going to object to that in terms of confidentiality, but she can state what her age is.

A    My age is 50.

Stewart.  It's been a number of years.  Probably just before I became the language access director of the agency.

Q    What position do you recall that Georgia Stewart held at the time that you met her?

A    I do not recall.

Q    You do recall that at some point she was a mediation coordinator for the OHR; is that correct?

A    Yes, I do remember that.

Q    Is that the position that she held when you terminated her?

A    She was the mediation manager at the time that I supervised her, yes.

Q    Exactly why did you terminate Ms. Stewart?

A    Well, as I explained in the memo I used for the Department of Human Resources, I was having difficulty managing Ms. Stewart and getting her to work collaboratively with me and other managers in order to achieve the outcomes

of the agency.

Q    Now, explain that.

A    Which part?

Q    The part that you stated the reason why you fired her was because you were having some difficulty with her work.

A    There were primarily two or three reasons:  Because the agency had grown dramatically over the time that I was the director; and the demands on all the managers were much higher.  I communicated changes to those managers, including Ms. Stewart, and I was not able to get her to comply with deadlines. And because every case that enters the agency must pass through mediation, when those deadlines weren't met, they had really devastating effects on the rest of the work that the agency departments were in charge of.

Q    What kind of deadlines did she fail to meet?

A    Deadlines, for example, updating information in our case management system.  When

a case proceeded through mediation, the case would either settle or not settle, or enter a pending status. And that information needed to be inputted into the case management system in a timely fashion. However, when the information was not input into the system, it created, again, very big problems for the rest of the agency.

Q    What kinds of problems did it create?

A    Well, when a case was not updated, then an investigator who was assigned to begin investigation on the case would not know whether to begin their investigation or not. In some cases, they might begin an investigation and then find out a week or a month or two months later that the case had been in fact settled. So it created inefficiencies for a team that was, like all the teams, facing an increased volume of workload.

Q    It is your testimony that somehow your investigators were finding out that a case had settled a month or so after it had actually

settled?

    A    That's correct.

    Q    But the process of inputting data into the system, that's a clerical function, isn't it?

    MS. OKEREKE:  Objection.  Argumentative. You can answer.

    A    By clerical -- I mean, we're an agency that doesn't have very many administrative staff people, so all of us have to perform our own administrative or clerical functions in many instances.  Whether it's updating the case management system, answering the phone, scheduling a meeting, making photocopies, all the managers do that.

    Q    So you were having difficulty with Ms. Stewart with regard to her fulfilling certain functions, which are primarily clerical?

    MS. OKEREKE:   Objection.  Mischaracterizes the testimony.  You can answer.

    A    Every manager at the agency is responsible for ensuring that they and their

team enter accurate and reliable and timely information into the case management system.  In some instances, the manager does it; in some instances, a designated staff person is to do it.

Q    This has a negative impact on your investigation function?

A    Well, we have a case management pipeline, so cases move through intake, mediation, investigations, legal review and then they're settled.  So a problem at any point in the pipeline creates a problem for the entire system.

Q    Let me get this straight.  You all -- what impact -- you all have a contract with EEOC; is that correct?

A    That's correct.

Q    And you also have a contract with HUD: is that also correct?

A    That is correct.

Q    And HUD pays you essentially to investigate some of their housing; is that

EEOC deferral case, you also have to investigate that case to compliance manual standards; is that correct?

A    I'm sure that is correct, yes.

Q    What does the compliance manual say that is the first step that an investigator must take?

A    All of our cases are treated equally at the agency.  So the first step for a case when it's received at the agency is to be assigned by an investigations manager to an investigator, at the same time that it proceeds through intake and being assigned for mediation. So those cases move through the agency in the most efficient manner possible.

Q    Your mediation is mandatory; is that correct?

A    That is correct.

Q    Whereas with EEOC, it's totally voluntary?

A    That is correct.

Q    So what does the compliance manual,

MR. DAVIS:  Do you know?

MS. OKEREKE:  -- is not familiar with the manual right now.

THE WITNESS:  I have seen the manual.  I cannot tell you what all the steps are.

BY MR. DAVIS:

Q    What does the District of Columbia Office of Human Rights regulations say that must be done with respect any mediation?

MS. OKEREKE:  Objection to form.  You can answer.

A    I don't know what your question is. The first step in the mediation?  Or scheduling a mediation?  I'm not sure.

Q    Who runs the mediation unit now?

A    The manager of the mediation unit at this time is Albert Santiago.

Q    Your statement is essentially Ms. Stewart was terminated because she wasn't fulfilling this clerical function of inputting data into the system?

MS. OKEREKE:  Objection.  Misstates the

testimony.

A    No, sir, that is -- that's not my statement.

Q    What is your statement?

A    My statement is that I was Ms. Stewart's supervisor and there were a number of ways in which it became very difficult to supervise Ms. Stewart.  Ms. Stewart would not follow direction.  And one example of that is ensuring that she and her team kept information up to date in a timely and accurate fashion in the case management system.  That's one example.

Another example that I mentioned in writing in my memo to DC Human Resources is that Ms. Stewart's inability to supervise a member of her team.  Ms. Stewart's inability to produce at management team meetings and staff meetings.  And Ms. Stewart's use of contractors when in fact there was staff available to staff mediation.  So there were a number of reasons, and the updating of the case management system was one example.

Q    Did you document your difficulty supervising Ms. Stewart?

A    I documented it in a memo to DC Human Resources.  I did.

Q    Did you ever attempt any corrective action towards her with respect to attempting to cure some of the deficiencies in her work performance?

A    I met with Ms. Stewart periodically, on a monthly basis, as I did with all managers.

Q    Did you document those meetings?

A    I do not have documentation available.

Q    Well, you either documented the meetings or you didn't.

A    I periodically took notes, yes.

Q    So there is a paper trail that you established with respect to documenting Ms. Stewart's performance?

A    Yeah -- I'm not sure what a paper trail might look like, but there were --

Q    Well -

A    -- a number of meetings where I met

type of document or policy requirement under DC
Human Resources.  But I did provide guidance and
I made requests to Ms. Stewart to improve, yes.

Q    Were you aware how long Ms. Stewart
had been employed by the Office of Human Rights
at the time you terminated?

A    Yes, roughly.

Q    When you say roughly, what does that
mean?

A    I can't say the exact number of years,
months or days, but I knew that she had been
employed with the office for at least 30 years,
on and off.  I think there was a break in
service at some point.

Q    You're a lawyer; that's correct?

A    That's correct.

Q    Have you ever practiced law?

A    By practiced law, do you mean
litigated --

Q    Have you ever --

A    -- in a courtroom?

Q    -- litigated a case?

report for EEOC; is that correct?

A     I believe we submit the number of cases closed, yes.

Q     Did she have any responsibility for that report?

A     I don't remember.

Q     Let me get this straight.  You terminated her because she was a poor performer?

A     The reasons for her termination were that it was becoming very difficult to give her instruction and to get her to follow directions when it came to updating the case management system, which was a central function of the mediation team.  Because all cases at the agency proceed through mediation.  It's mandatory.  So that was one of the primary reasons she was terminated.  There were other reasons, as I stated, and I'm happy to repeat them.

Q     Well, repeat them for me.

A     I'd be happy to.  The second reason was because Ms. Stewart wasn't able to supervise or manage some of her mediators.  In one

instance, there was a mediator that was hired.
She informed me she was no longer able to
supervise him.  In another instance there was a
mediator who informed me that she had very
little work to do because Ms. Stewart would not
assign her cases.

Q    Who was that mediator?

A    The name of that mediator who did not
have enough work?

Q    Right.

A    Nellie Phelan, P-H-E-L-A-N.

Q    Did you generate any kind of
communication with Ms. Stewart with respect to
that?

A    I don't remember.

Q    But you said that you did keep -- in
fact, keep a paper trail.

MS. OKEREKE:  Objection.

A    I did not say that.  No.  Ms. Phelan
informed me of that after she left the agency,
so I was not able to address it at the time that
she worked there.

Q    Did you address it with Ms. Stewart?

A    No, because I was informed after she left the agency, so she was no longer employed or supervised by Ms. Stewart.

Q    She didn't have enough work?

A    That's correct.

Q    Did there come a time when you hired mediators for Ms. Stewart?

A    I hired mediators with Ms. Stewart, and there were two mediators that were hired during her tenure while I was there.

Q    Who were they?

A    The first -- well, there may have been three.  I believe one of the first was Albert Santiago, who requested to be moved to Ms. Stewart's unit.  And in consultation with her, he was moved into her unit because he wanted to move out of intake and serve as a mediator.  I believe he went through certification and then, you know, lobbied Ms. Stewart to become part of the mediation team and he was moved into that team.

The second person I believe was Mr. Keith Grimes, who was a contractor with the mediation unit and Ms. Stewart knew him, had known him professionally for many years, and requested that we interview him and hire him as a mediator.  And I agreed to interview him with her, and then she asked to select him as the mediator.  I selected him.  He was terminated a few months later.

And then there was a third mediator, Ms. Linda Taylor.  Ms. Stewart sat in on the hiring interviews for Ms. Linda Taylor, and she was selected to be a mediator.  I believe those are the three.

Q    Now, Nellie Phelan -- is that how you pronounce her name?

A    I think so.

Q    Phelan?

A    Phelan, or Phelon.

Q    She actually worked in another unit at the OHR prior to coming to mediation, didn't she?

BY MR. DAVIS:

Q    What is the reason that you gave for her termination?

A    The reasons I gave for her termination were, again, that she -- as I stated earlier, she was not compliant and did not follow direction under the requirements that we had to update the case management system in a timely, accurate and reliable way.

Ms. Stewart was not able to supervise the employees under her charge in an effective way, and I gave examples of that earlier. There was one individual who she selected as a mediator and then communicated to me she was not able to supervise any longer and needed me to terminate him, so I did. And then there was a second individual who I found out later on, after she had left the agency, was not kept busy with work.

Q    And you found that out after Ms. Phelan had left?

A    After she resigned, to be precise.

Q      After she resigned?

A      Yes.

Q      And I think you testified that in fact you went in to her office to see her, to wish her good luck or say farewell or whatever, and that's when she told you that she was not kept busy?

A      Yes, that's correct.

Q      Did she ultimately come back to the agency?

A      She did not return as a full-time employee, no.

Q      She returned as a contractor?

A      She worked with us, for a couple of months maybe, as a contractor, maybe a year, year and a half ago.

Q      She worked for a couple of months?  Do you know how many cases she did during that period of time?

A      She was assisting, I believe, to investigate a case but was not mediating cases. Yes.

A    I was aware, as I said earlier, that she had worked in the Office of Human Rights for the District government for at least 30 years, yes.

Q    Did it ever occur to you to give her an opportunity to resign?

A    I'm not sure what an opportunity to resign would look like.

Q    Well, you know, I mean, that -- it never struck your senses where you just say to the person, this is not working?

A    Ms. Stewart was offered a separation agreement, but she declined.

Q    Well, she's required to be offered a separation agreement, isn't she --

A    As an MSS --

Q    -- because she -

A    -- employee, no.

Q    As an MSS employee?

A    As far as my knowledge, an MSS employee is an at-will employee and can be terminated at will.

Q    Who in your office represents the decision of the OHR before the commission?

A    Our Office of General Counsel does.

Q    How many attorneys are in that office?

A    Currently there are -- including the general counsel, there are two because one currently went on to get another job.

Q    So there are actually three slots?

A    Yes.

Q    Three FTEs, as it were?

A    Yes.

Q    What is the MATS SYS (phonetic)?

A    That's our case management systems. It's a form of Quickbase platform where people track data in the cases as they move through the office.

Q    Do you all have a dedicated person in the office who is charged with updating MATS?

A    No, we do not.  Each unit has to provide their own updates to MATS.

MR. DAVIS:  Let me pause just for a moment. I may be on the way to finishing.

(There was a brief pause in the proceedings.)

BY MR. DAVIS:

Q    So each unit is required to update MATS?

A    Yes.  The intake unit, mediation unit, investigations, yes.

Q    When the investigation unit updates MATS, do they have updates to show what stage in the investigation the case is?

A    In terms of case notes?  I believe MATS allows for individuals to upload documents and case notes, yes.

Q    When you say upload documents --

A    Um-hum.

Q    -- so there would be an uploaded investigation for each case?

A    I don't know if they upload those, or they may keep those in their case files, or both.

Q    Why wouldn't you know that?

A    Because it's up to the investigations

manager to ensure that that investigations plan exists. Whether it's digital or paper or both, I'm just not sure at this time.

Q    But as a matter of policy, it is not required that the investigation plan for each case be uploaded?

MS. OKEREKE:  Objection to form. It mischaracterizes the testimony.

A    It's the best practice.  And actually we're currently building a new case management system that will be much better at tracking these types of things.

Q    So the MATS system, what is the signal feature of the MATS system?  What is the most important component of the MATS system?

MS. OKEREKE:  Objection.  Vague.

A    I'm sorry.  Are you talking about data points or --

Q    Yes.  What would be the critical data points for a case, for an OHR case, under the MATS system?

A    I think that varies, but at the out --

at the opening of the case, you have to include the party's information and whether or not the party, complainant, is represented by counsel, and contact information. Those would be the initial data points, but then there are hundreds of data points after that.

Q     Can you give me an example of some of those hundreds of data points?

A     Yes.  We would have to include whether the case is scheduled for mediation, or rescheduled, when mediation occurred, whether a case was settled, if the case was not settled and moved to investigation, and the interactions between investigators and the parties will be documented both in the case file and the case management system.  So that could take a number of months, or longer, depending on the life of the case.

Then the cases go to legal review – then they go to investigations supervisor, and it may go back and forth between the investigator and the supervisor many times; and then it may go to

legal review.  So there are just a number of steps that the case management system is designed to capture.

Q    Each manager is responsible for updating MATS SYS?

A    Each manager is responsible for ensuring that they or their team meet all their obligations in updating the case management system.

Q    Does that account for the workload of the unit?  I mean, for instance, how many people are there currently employed in mediation?

A    Currently employed?  One, two, three, there are four people.

Q    Can you name them?

A    The positions and their names?

Q    I think you said that Mr. Santiago is the mediation supervisor.

A    Yes, that's correct.  Then there's Eloisa Rocha, who is the administrative assistant.  And there are two full-time mediators, Linda Taylor and Sterling -- I'm

wrapped up fairly quickly.

MR. OKEREKE:  Sure.

(A recess was taken.)

BY MR. DAVIS:

Q    Ms. Palacio, were there any other units in the OHR that had difficulty keeping up their work updating MATS?

A    Could you be more specific as to when?

Q    Contemporaneous with the time that you terminated Ms. Stewart.

A    Not to my recollection, no.

Q    How long had Ms. Stewart had the problem with keeping up with her work?

A    Let's see.  I came in in 2000 -- the end of 2013, and I began supervising Ms. Stewart around that time.  I'd say that the problem surfaced towards the end of 2015 and early 2016.

Q    Again, you have it documented when these problems arose?

MS. OKEREKE:  Objection.  Mischaracterizes the testimony.

A    Yes.  I stated earlier that I

discussed the problems with Ms. Stewart and that I documented them in my notes to DCHR.

Q     But you never sent anything in writing to Ms. Stewart regarding any deficiency you found in her work?

MS. OKEREKE:  Objection.

A     No.

MS. OKEREKE:  Mischaracterizes the testimony.

A     That's not what I said.  There were emails where I did state some of the issues and they were discussed with Ms. Stewart.

Q     And you did provide those emails to your counsel?

A     Yes.

Q     Is that correct?

A     Yes.

Q     At some point, I have seen a document where you spoke to an inappropriate relationship between Ms. Stewart and one other employee.

MS. OKEREKE:  Objection.  Lack of foundation.

A    I believe I referenced that there had been reports to me by other employees that there may have been an inappropriate relationship between Ms. Stewart and Mr. Keith Grimes, yes.

Q    And it was reported to you by other employees?

A    Yes.

Q    Can you name any of those employees?

A    I don't remember at this time.

Q    Did you call it to Ms. Stewart's attention?

A    I spoke with Ms. Stewart about her relationship with Mr. Grimes in terms of what was going well and what were the challenges. And I asked her to tell me about that, and that's when she sent me an email detailing the challenge that she had working with him.

Q    She ultimately recommended that you terminate him; is that correct?

A    Yes, that's correct.

Q    And you did in fact terminate him?

A    I did, yes.

MS. OKEREKE:  Objection.

A    I don't know.  I don't know if they do, but they certainly don't provide funding for it.

Q    They just fund actual case investigations; is that correct?

A    Yes.  We have a fee-for-service contract.

Q    Now, did Ms. Stewart's handling of her personnel have anything to do with your terminating her?

A    Her ability to manage and supervise --

Q    Yes.

A    -- her employees?  Yes, it did.

Q    Did you ever document her deficiencies in that regard?

A    I believe there were some emails to that effect, yes.

Q    An email that you would have generated to her?

A    Yes.  And generated I think by some other managers.

Q    And you would have supplied those to your counsel; is that correct?

A    The ones that I was aware of, yes.

Q    In sum, you terminated Georgia Stewart because she had performance problems which she was unsuccessful in overcoming; is that correct?

A    Yes, I'd say that's correct.

Q    And she was not performing as the mediations manager to your satisfaction?

A    Yes, that's correct.

Q    And you also made a determination at some point that she was MSS?

A    As far as her employment records stated, she was MSS.

Q    Don't you have to sign a document agreeing to be an MSS?

MS. OKEREKE:  Objection.

A    I'm not familiar with all the documents an employee might sign at any given point in time, but some employees maybe do sign, yes.  I was not the one that hired her into that position.

# EXHIBIT 5

**Robinson, Ebony (OHR)**

| | |
|---|---|
| **From:** | Palacio, Monica (OHR) |
| **Sent:** | Friday, March 03, 2017 12:22 PM |
| **To:** | Robinson, Ebony (OHR) |
| **Subject:** | Privileged Confidential - GS |
| **Attachments:** | Keith Grimes' Performance Issues.docx |

**Importance:**        High

**Mónica Palacio | Director**
District of Columbia Office Of Human Rights
Main: 202.727.4559

**From:** Stewart, Georgia (OHR)
**Sent:** Monday, February 29, 2016 5:21 PM
**To:** Lee, Ayanna (OHR); Palacio, Monica (OHR)
**Subject:** Keith Grimes
**Importance:** High

**Georgia Stewart**
**Program Director**
**Mediation Division**

D. C. Office of Human Rights
441 4th Street, N. W., Room 570N
Washington, D. C.  20001
Direct: (202) 727-4921
Main: 202.727.4559
Fax: (202) 727-9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

 

*This email and any files transmitted with it could contain confidential information and are intended solely for the use of*
*the individual or entity to whom they are addressed.  If you are not the named addressee, you should not disseminate,*
*distribute or cop his e-mail. Please notify the sender immediately by e-mail if you have received this e-mail in error and*

1

D.C._17 CV 495_000108

*delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

Learn the basics of life-saving hands only CPR in 20 minutes. Visit the DC FEMS Hands on Hearts campaign at http://handsonhearts.dc.gov to sign up for existing classes or email hands.onhearts@dc.gov to schedule a class for your office or organization.

2

D.C._17 CV 495_000109

Performance Issues – Keith Grimes

During Mr. Grimes' tenure with OHR, his performance has deteriorated.

Within the first 90 days of his employment, Mr. Grimes made statements that were sexual in nature to two female coworkers. I explained to Mr. Grimes that this behavior is unacceptable, but his behavior did not change. Within the last 45 days, other allegations of unacceptable of sexual statements have been reported. I cautioned Mr. Grimes about his behavior and recommended sexual harassment training.

Mr. Grimes has been observed sleeping at his desk on numerous occasions. I told Mr. Grimes that if he had a medical condition, he needed to submit documentation to Human Resources. Mr. Grimes stated that he did not feel well on those occasions.

As his supervisor, I recommended he make changes to settlement agreements because of typos; typos reflected a monetary amount of $2.000.00 instead $2,000.00. Mr. Grimes insisted that I forward the two documents, stating that the Agreements are contracts and he could not change them.  I recommended that he contact the parties, explain the typos, and request that they initial the changes to the documents or request that the parties re-sign the Settlement Agreements. I had to insist that he make the changes. On another occasion, the Settlement Agreements had the wrong letterhead that reflected the former Mayor Gray instead of Mayor Bowser.

Mr. Grimes frequently consults with other units in the Office outside of the Mediation unit regarding proposals to resolved Complaints, which is a violation of the Firewall.

Mr. Grimes previously had a conflict with the General Counsel for the Department of Transportation. Because of the conflict, I informed Mr. Grimes that I would co-mediate the Conciliation with him. However, Mr. Grimes went ahead and started the session without me present.

When I am debriefing with contract Mediators, Mr. Grimes frequently walks into my office, takes over the conversation, and addresses me in a condescending manner.

Eloisa trained Mr. Grimes on how to use the Mediation calendar and MATS. I have repeatedly requested that he update the Mediation calendar so that MATS is accurate. I attempted to show him how to color code the Mediation calendar and informed him that he can call OCTO for assistance, and as of today , February 29, 2016, he has not mastered the proper use of colors on the Mediation calendar.

I have requested and cautioned Mr. Grimes to call and leave a message when he is going to be late. On two occasions, he did not call to say he would off, and I had to repeatedly call him to determine the type of leave he was on.  Today, February 29, 2016, Mr. Grimes was scheduled for two Mediations – at 10:00 a. m. and 11:00 a. m. Mr. Grimes arrived for work at 11:30 a. m.

D.C._17 CV 495_000110

# EXHIBIT 6

**To:**      Palacio, Monica (OHR)[monica.palacio@dc.gov]
**From:**    Stewart, Georgia (OHR)
**Sent:**    Tue 6/2/2015 3:33:12 PM (UTC)
**Subject:** RE: Management team meeting starting

Ok.

Georgia Stewart
Program Director
Mediation Division

D. C. Office of Human Rights
441 4th Street, N. W., Room 570N
Washington, D. C.  20001
Direct: (202) 727-4921
Main: 202.727.4559
Fax: (202) 727-9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

Â  Â Â Â

-----Original Message-----
From: Palacio, Monica (OHR)
Sent: Tuesday, June 02, 2015 11:03 AM
To: Stewart, Georgia (OHR)
Subject: Re: Management team meeting starting

We are discussing production schedule. I need you here.

Monica Palacio
Sent from my iPhone

> On Jun 2, 2015, at 10:16 AM, Stewart, Georgia (OHR) <georgia.stewart@dc.gov> wrote:
>
> Hi Monica,
>
> If it is ok, I would like to be excused from the meeting today.  We have seven Mediations scheduled and Nellie's computer screen is frozen.
>
> Georgia Stewart
> Program Director
> Mediation Division
>
> D. C. Office of Human Rights
> 441 4th Street, N. W., Room 570N
> Washington, D. C.  20001
> Direct: (202) 727-4921
> Main: 202.727.4559
> Fax: (202) 727-9589
>
> ohr.dc.gov
> facebook.com/DCOHR

D.C._17 CV 495_000516

> twitter.com/dchumanrights
> instagram.com/dchumanrights
>
>
>
> -----Original Message-----
> From: Palacio, Monica (OHR)
> Sent: Tuesday, June 02, 2015 10:05 AM
> To: Stewart, Georgia (OHR)
> Subject: Management team meeting starting
>
> Join us as soon as you arrive please
>
> Monica Palacio
> Sent from my iPhone

D.C._17 CV 495_000517



**From:** Stewart, Georgia (OHR)
**Sent:** Thursday, September 03, 2015 6:18 PM
**To:** Lee, Ayanna (OHR)
**Cc:** Palacio, Monica (OHR)
**Subject:** RE: Management Team Meeting

Hi Ayanna,

I have an appointment early tomorrow morning and will arrive as soon as possible.

Georgia

**Georgia Stewart**
**Program Director**
**Mediation Division**

D.C._17 CV 495_000570

D. C. Office of Human Rights

441 4th Street, N. W., Room 570N

Washington, D. C.  20001

Direct: (202) 727-4921

Main: 202.727.4559

Fax: (202) 727-9589

**ohr.dc.gov**

facebook.com/DCOHR

twitter.com/dchumanrights

instagram.com/dchumanrights



CONFIDENTIAL: This message is confidential and is intended only for the use of the individual or entity to which it is addressed. The information contained in this transmission may be protected under federal law or other applicable law. If you are not the intended recipient of this transmission, you are hereby notified that any distribution, dissemination, or duplication of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by return e-mail or by phone at (202) 727-4921. Thank you.

**From:** Lee, Ayanna (OHR)
**Sent:** Thursday, September 03, 2015 4:21 PM
**To:** Ansah-Brew, Josephine (OHR); Chandy, Sunu (OHR); Coefield, Rahsaan J. (OHR); Greenfield, Suzanne (OHR); Imse, Elliot (OHR); Khaing, Hnin (OHR); Lee, Ayanna (OHR); Palacio, Monica (OHR); Simmons, David (OHR); Stewart, Georgia (OHR); Teferi, Winta (OHR)
**Subject:** Management Team Meeting

Good Afternoon Management Team,

D.C._17 CV 495_000571

This is a reminder that tomorrow's meeting will take place from 10:00am - 11:30am in room 1117.  It is imperative that everyone be in attendance as we will be discussing construction updates and fiscal year close-out.  Thanks

**Ayanna E. Lee**
**Operations and Human Resource Manager**

District of Columbia Office of Human Rights
441 4th Street, N.W., Suite 570N
Washington, D.C.  20001

Main: 202.727.4559
Direct: 202-727-2193
Cell: 202-213-4130
Fax: 202.727.9589

**ohr.dc.gov**
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights



#ThriveByFiveDC kicks off this month! Learn more about Mayor Bowser's commitment to early childhood and visit the District's first comprehensive child health and early learning website at ThriveByFive.dc.gov.

#ThriveByFiveDC kicks off this month! Learn more about Mayor Bowser's commitment to early childhood and visit the District's first comprehensive child health and early learning website at ThriveByFive.dc.gov.

**To:**       Palacio, Monica (OHR)[monica.palacio@dc.gov]
**From:**    Stewart, Georgia (OHR)
**Sent:**    Tue 7/19/2016 9:27:03 PM (UTC)
**Subject:** RE: Notice

Sorry Monica,

We had several Mediations and Eloisa had an emergency medical situation, her mother  is in the hospital and she had to leave this morning.  She is at the hospital as we speak because her mother is waiting for a CAT scan.
Going forward, I will send an email in like situations.

Georgia

-----Original Message-----
From: Palacio, Monica (OHR)
Sent: Tuesday, July 19, 2016 4:31 PM
To: Stewart, Georgia (OHR)
Subject: Notice

Hi Georgia-

You did not attend the staff meeting this morning and you didn't inform me. What happened?

Monica

Monica Palacio
Sent from my iPhone

D.C._17 CV 495_000534

**To:** Palacio, Monica (OHR)[monica.palacio@dc.gov]
**From:** Stewart, Georgia (OHR)
**Sent:** Thur 9/22/2016 2:01:10 PM (UTC)
**Subject:** Staff Meeting

Hi Monica,

I am dealing with two Conciliations scheduled for today. I will report a little late for the Staff Meeting. I tried to clear matter up last night, but was unable to do so.

Georgia

**Georgia Stewart**

**Program Director**

**Mediation Division**

D. C. Office of Human Rights

441 4th Street, N. W., Room 570N

Washington, D. C. 20001

Direct: (202) 727-4921

Main: 202.727.4559

Fax: (202) 727-9589

**ohr.dc.gov**

facebook.com/DCOHR

twitter.com/dchumanrights

instagram.com/dchumanrights

 

*This email and any files transmitted with it could contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail in error and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

D.C._17 CV 495_000550

# EXHIBIT 7

**To:**      Palacio, Monica (OHR)[monica.palacio@dc.gov]
**From:**   Stewart, Georgia (OHR)
**Sent:**    Thur 5/12/2016 9:37:53 PM (UTC)
**Subject:** Meeting on 5/11/2016

Good Afternoon,

I would like to inform you that I am concerned regarding the behavior of Rahsaan Coefield yesterday during our meeting when he "yelled" stating that my unit was "dysfunctional" and when I asked him why he was yelling, he stated that "you annoy me".

I felt intimidated and humiliated by this hostile behavior. I am saddened that you did not intervene on my behalf and I had to ask that the meeting be adjourned because I felt intimidated and Coefield again stated that I felt "intimidated conveniently".

As you are aware, Mr. Coefield is responsible for EEO training for the District Government Agencies and other venues. Please see the production for Investigations and Mediations below:

**Total Closures for Office as of 10/1/2015 to present: 424 via IMS System**

Of the total closures, 264 were settled in Mediation - total settlement dollars: $2,879,844.87;

11 Successful Conciliations

10 unsuccessful Conciliations

16 Administrative Closures

**Total- 301**

According to IMS Investigation closure as of 10/1/2015 to present:

90 administrative closures

30 NPC

26 Probable Case Determinations

**Total - 146**

Lastly, this should not happen to any employee supervised by Rahsaan Coefield, Esq. Deputy Director. We the Office of Human Rights and as stated in our mission, "The District of Columbia Office of Human Rights (OHR) was established to eradicate discrimination, increase equal opportunity and protect human rights for persons who live in or visit the District of Columbia. The agency enforces local and federal human rights laws, including the DC Human Rights Act, by providing a legal process to those who believe they have been discriminated against. OHR proactively enforces human rights in the District through Director's Inquiries, which allow it to identify and investigate practices and policies that may be discriminatory". We the Office should practice and enforce our mission in-house as well.

Sincerely,

Georgia

**Georgia Stewart**

**Program Director**

**Mediation Division**

D. C. Office of Human Rights

441 4th Street, N. W., Room 570N

Washington, D. C. 20001

Direct: (202) 727-4921

Main: 202.727.4559

Fax: (202) 727-9589

ohr.dc.gov

facebook.com/DCOHR

twitter.com/dchumanrights

instagram.com/dchumanrights



*This email and any files transmitted with it could contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail in error and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

D.C. 17 CV 495_000540

# EXHIBIT 8

**To:**       Palacio, Monica (OHR)[monica.palacio@dc.gov]
**From:**     Stewart, Georgia (OHR)
**Sent:**     Fri 6/17/2016 3:54:25 PM (UTC)
**Subject:**  Concerns Following 6/7/2016 Meeting.

Thank you for your email of June 7, 2016. I am attempting to address the need to be more efficient in the update process, and I do have ongoing concerns. I do wish to clarify my statement about Rahsaan Coefield. I do not consider the matter closed. I want to be clear that I have done as much as I can to relay my concerns that Rashaan's communication with me is toxic, patronizing, incentive, unprofessional and hostile. To the extent that he is on OHR's management team, I would expect more civility. I do not know if it is because I am a woman, elderly, or that he simply doesn't like the way I look. You observed the comment when I suggested that I felt "intimidated" and he stated "conveniently."

I am particularly concerned that Rahsaan's behavior mirror the hostility that I experienced with the previous Director of which you are well aware. I think the matter requires communication sensitivity, not snide remarks and personalizing professional issues.

I also want to note that the climate of hostility has affected others in the Office and now and for some reason, people are treating me differently. It goes without saying that this continued hostility is affecting my emotional health. I will respond to the MATS issue by separate correspondence.

**Georgia Stewart**
**Program Director**
**Mediation Division**
D. C. Office of Human Rights
441 4th Street, N. W., Room 570N
Washington, D. C. 20001
Direct: (202) 727-4921
Main: 202.727.4559
Fax: (202) 727-9589
**ohr.dc.gov**
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights




*This email and any files transmitted with it could contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail in error and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

Get involved! The New Columbia Statehood Commission invites residents of the District of Columbia to participate in the Constitutional Convention on June 13th (6:30pm) at the DC Taxicab Commission and June 17th-18th at Woodrow Wilson High School. Register today!

D.C._17 CV 495_000553

# EXHIBIT 9

# Lee, Ayanna (OHR)

| | |
|---|---|
| **From:** | Palacio, Monica (OHR) |
| **Sent:** | Tuesday, September 27, 2016 11:33 AM |
| **To:** | Radabaugh, Margaret (DCHR) |
| **Cc:** | Lee, Ayanna (OHR) |
| **Subject:** | Confidential |
| **Attachments:** | Confidential Memo to DCHR FINALdocx.docx |
| **Importance:** | High |

Hi Margaret –

I am sending you the final memorandum regarding Ms. Georgia Stewart. I understand the next step is for Director Gibson to review and approve.

I truly appreciate your helpful guidance and assistance as we handle this matter.

Sincerely,
Mónica

**Mónica Palacio**
*Director*
*Pronouns she/her*

District of Columbia Office of Human Rights
441 4th Street, N.W., Suite 570N
Washington, D.C. 20001

Main: 202.727.4559
Fax: 202.727.9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

 

*STATEMENT OF CONFIDENTIALITY: The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressees and may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.*

D.C._17 CV 495_000141


Government of the District of Columbia
Mayor Muriel E. Bowser


Office of Human Rights
DISTRICT OF COLUMBIA

One Judiciary Square
441 4th Street NW, Suite 570N
Washington, DC 20001
202.727.4559 tel
202.727.9589 fax
ohr.dc.gov

## MEMORANDUM
### (Privileged & Confidential -- Deliberative Process)

To:     Margaret GC, DCHR

From:   Mónica Palacio, Director of Office of Human Rights

Date:   September 20, 2016

Re:     Separation of Ms. Georgia Stewart

---

I am writing to request that the District's employment relationship with Ms. Georgia Stewart be terminated. I have served as Director of OHR since November 2013, during which time Ms. Stewart has served as an MSS employee in the position of Mediation Manager. I have detailed some but not all of her performance issues in this memorandum. I can provide additional details or examples upon request.

1. Failure/Refusal to Follow Agency Case Processing Guidelines

     In meetings with me, OHR's previous Deputy Director and OHR's current General Counsel, Ms. Stewart is disrespectful to her colleagues and challenges questions posed by me in my role as Director. More specifically, she has refused to follow my instructions and repeated requests with regard to case management procedures within the agency (see example below).

     Case Management Issues: During meetings held in 2014, 2015 and 2016 Ms. Stewart was informed by me that she must update OHR's case management system within a 48 hour period after the parties have completed a mediation session within her unit. Over the last three years she has consistently refused to provide consistent and reliable updates; she has refused to assign this duty to one of her subordinates and she will not cooperate in developing a system so that other managers or staff can assume the responsibility. This step is vital in order to ensure that cases are processed in a timely and efficient manner and Ms. Stewart has refused to meet this responsibility even after direct requests and directives from me.

2. Failure to attend management meetings and/or collaborate with other managers

     Over the last two years, Ms. Stewart has regularly failed to attend management team meetings and all staff meetings or she comes into the meetings late or leaves early. Often when she arrives she interrupts the meeting agenda, makes unprofessional comments or refuses to participate. On certain occasions she asserts that she has a scheduling conflict, however, these meetings are only held once a month and scheduled in advance to be held regularly on the first and second Tuesdays of the month respectively. Notices and reminders are sent to all staff and managers via Outlook. Nevertheless Ms. Stewart often claims she did not know there was a meeting being held or claims she did not know she was to attend.

1

D.C._17 CV 495_000142

Recent Example:

On September 6th of this month Ms. Stewart did not attend the agency's management team meeting and did not notify me that she had a conflict or that she would not attend. When questioned by the Interim Deputy Director as to why she did not attend she claimed she thought the meeting was for upper management staff only. The category of "upper management" is not a distinction used at OHR and this is an example of Ms. Stewart avoiding responsibility and disregarding a request from me as the Director.

Previous Meetings

On previous occasions my Executive Assistant has had to call and/or text or email Ms. Stewart in order to locate her prior to the start of a management team meeting.

3.  Poor Professional Judgment and Ineffective/Wasteful and Punitive Management Decisions

Part 1  During FY15 one of Ms. Stewart's staff mediators resigned and then communicated to me that Ms. Stewart consistently ignored her requests for additional work and often scheduled contract mediators (non-FTEs) to handle necessary additional work. After handing in her notice, the former employee told me Ms. Stewart consistently excluded her from conversations about work assignments and refused to give her a chance to contribute to the mediation unit. I was stunned to learn this information as Ms. Stewart always spoke highly of this employee, yet, refused to give her more work. I then insisted that Ms. Stewart send me spreadsheets detailing the cases assigned to each mediator each month so that I could better understand her use of contractors. This practice dropped off for many months but I reinstituted it during June of this year and regularly ask Ms. Stewart whether her staff mediators are scheduled with sufficient frequency however, I can no longer rely on her answers. That position was filled in later FY14 and I check in with that mediator regularly to ensure there workload is appropriate.

Part 2  At the beginning of FY16, Ms. Stewart vehemently advocated that the agency hire one of the contract mediators to fill a second mediator position. Based on her recommendation I agreed to interview and hire the person (Mr. Keith Grimes). Within one month Mr. Grimes had been seen sleeping in his office, coming in late and leaving early (at odd hours). During month two there were complaints from several female managers that Mr. Grimes was staring at women in the office, asking inappropriate personal questions and several people believed that Mr. Grimes and Ms. Stewart had begun having an inappropriate relationship. I met with Ms. Stewart on several occasions to discuss her ability to supervise and give warnings and feedback to Mr. Grimes. Not long after Ms. Stewart came to me and told me Mr. Grimes was being rude and disrespectful to her and that she no longer felt she could supervise him. I terminated Mr. Grimes shortly thereafter.

D.C._17 CV 495_000143

# EXHIBIT 10

 **Government of the District of Columbia**
Mayor Muriel E. Bowser


**Office of Human Rights**
DISTRICT OF COLUMBIA

One Judiciary Square
441 4th Street NW, Suite 570N
Washington, DC 20001
202.727.4559 *tel*
202.727.9589 *fax*
ohr.dc.gov

**Office of the Director**

*September 30, 2016*

Georgia Stewart
235 Quackenbos St., NE
Washington, DC 20011

**Subject**: Notice of Separation

Dear Ms. Stewart:

This letter serves as notice of at least 15 days[i] of your separation from your Management Supervisory Service appointment as the Supervisory Equal Opportunity Specialist with the District of Columbia Office of Human Rights. Your separation will be effective close of business October 15, 2016. Effective today, you will be held in an administrative leave status, and earn your regular salary and benefits, until the effective date of this separation. As you know, appointments to the Management Supervisory Service are at-will and, therefore, this separation action is neither grievable nor appealable.[1]

You are to immediately return any and all government property, including, without limit, building keys, office keys, security badge(s), pass card(s), and cell phone(s). Additionally, you are required to immediately surrender all District Government paper-based or computer-based documents contained on computer disks, hard drives, storage drives and on any other type of electronic media containing such documents within your possession.

You can expect to receive a lump sum payment for any unused annual or universal leave. This payment will be subject to standard deductions and withholdings, excluding deductions for retirement or other benefits. This final payment will be issued once all property has been received.

A copy of this letter will be forwarded to the Office of Pay and Retirement Services (OPRS) for appropriate action. Any questions regarding payment dates should be directed to Diane Gidderon, Special Pay Officer, OPRS, at (202) 741-8630. You should contact Antwain Smith 202-442-9723 to schedule an exit interview. For your reference and appropriate action, enclosed is a Notification with general information on Temporary Continuation of Coverage regarding health benefits.

Notwithstanding the circumstances, I thank you for your public service to the District of Columbia. I wish you every success in your future pursuits.

Sincerely,

Monica Palacio
Director

---

[1] Section 3813 of Chapter 38 of the District personnel regulations, Management Supervisory Services.

D.C._17 CV 495_000030

**Notice of Separation Page T**

cc: Diane Gidderon, Special Pay Officer, OPRS
    Ayanna Lee, OHR HR
    Official Personnel Folder

Encl.

**ACKNOWLEDGEMENT OF RECEIPT**

_Refused to sign_
Employee Signature

_____
Date

_Pamela G. Brown_
Witness

_9/30/2016_
Date

_Refused to Sign
Based on discrimination
and Retaliation for
filing a previous.
Complaint of discrimination
also, I am an
outstanding Employee._

---

Page 2 of 3

D.C._17 CV 495_000031